# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

Minnesota Voters Alliance, Andrew Cilek, Kim Crockett, Craig Anderson, Yvonne Hundshamer, Craig Jones,

Plaintiffs,

v.

Tim Walz, in his official capacity as Governor of Minnesota, or his successor; Steve Simon, in his official capacity as Secretary of State of Minnesota, or his successor, Mark V. Chapin, in his official capacity as Hennepin County Auditor, or his successor, Christopher A. Samuel, in his official capacity as Ramsey County Auditor, or his successor, Keith Ellison, in his official capacity as Attorney General of Minnesota, or his successor, Mike Freeman, in his official capacity as Hennepin County Attorney, or his successor, John Choi, in his official capacity as Ramsey County Attorney, or his successor,

Defendants.

Case No. 20-cv-01688 (PJS/ECW)

**MEMORANDUM IN SUPPORT OF STATE DEFENDANTS' MOTION TO DISMISS**

## INTRODUCTION

Defendants Governor Tim Walz, Attorney General Keith Ellison, and Secretary of State Steve Simon ("State Defendants") move to dismiss Plaintiffs' First Amended Complaint in its entirety. Despite Plaintiffs' ill-conceived arguments to the contrary, no conflict of laws exists between the Emergency Executive Order 20-81 ("EO 20-81" or

"the Order") and Minnesota Statutes Section 609.735. Without that conflict, all Plaintiffs' claims are un-masked as baseless.

The Order is not an election-related law; it is a law of general applicability. The Order does not affect Plaintiffs differently than any other Minnesotan, and State Defendants are not enforcing it against Plaintiffs. Nevertheless, Plaintiffs are attempting to use the opportunity of the upcoming federal election to shoehorn their state law allegations--that the Governor is violating the Minnesota Constitution or statutes--into issues for federal resolution by citing the First Amendment and Elections Clause. Their transparent attempts fail, both because their federal law allegations are meritless, and because State Defendants have Eleventh Amendment Immunity from Plaintiffs' fundamentally state law claims. And even if this court had jurisdiction, the claims would fail, because the Order easily passes muster under the *Jacobson* standard for reviewing governmental action during a public health emergency.

## FACTUAL BACKGROUND[1]

### I. MINNESOTA'S RESPONSE TO COVID-19.

In response to the COVID-19 public health crisis,[2] Governor Tim Walz declared a

---

[1] The background is taken from the Amended Complaint, the EOs and documents embraced by the Amended Complaint, and matters of public record. These materials are properly considered on a motion to dismiss as well as a on a motion for a temporary restraining order. *See Miller v. Redwood Toxicology Lab., Inc*., 688 F.3d 928, 931 n.3 (8th Cir. 2012); *Little Gem Life Sciences, LLC v. Orphan Med., Inc*., 537 F.3d 913, 916 (8th Cir. 2008); Fed. R. Civ. P. 65. For the Court's convenience, the relevant documents embraced by the Amended Complaint and matters of public record are attached to the Declaration of Liz Kramer (Doc. 36.)

[2] A fuller description of COVID-19 was included in State Defendants' TRO response (Doc. 35.)

peacetime emergency on March 13, 2020. Order 20-01. [3] That same day, the President declared a National Emergency. (Kramer Decl., Ex. 9.) Minnesota has engaged in a comprehensive plan to combat COVID-19 that includes slowing the spread of the disease, protecting the capacity of the state's medical system to respond to the disease, and ensuring the continued operation of critical sectors to protect the public's access to necessary services and supplies. *See* EOs 20-02 through 20-86.

Despite those efforts, the pandemic has been devastating. 82,249 Minnesotans have tested positive for COVID-19 and 1,884 have died. (*Id.*, ¶ 9.) The virus has claimed over 190,000 lives in the United States since January 24, 2020. (*Id.*, ¶ 10.)

### A. EO 20-81 Requires Face Coverings.

On July 22, 2020, Governor Walz issued EO 20-81 requiring non-exempt people in Minnesota to wear face coverings in indoor business and public spaces. Thirty-four states have similar orders in place. (*Id.*, Ex. 20.)

EO 20-81 is consistent with the best advice from federal officials. According to the U.S. Centers for Disease Control and Prevention ("CDC"), face coverings are effective in preventing the transmission of respiratory droplets that may spread COVID-19. (EO 20-81, p. 2; *see also* Kramer Decl., Ex. 11-12.) CDC Director Robert Redfield has stated "[c]loth face coverings are one of the most powerful weapons we have to slow and stop the spread of [COVID-19]." (Kramer Decl., Ex. 11.) President Trump himself has encouraged the wearing of face coverings and the White House has

---

[3] All of Minnesota's Emergency Executive Orders regarding COVID-19 are available online at www.leg.state.mn.us/lrl/execorders/eoresults?gov=44.

encouraged Minnesota to "[c]ontinue to communicate the public health and economic benefits of compliance with the state masking mandate" and "[e]nsure compliance with current Minnesota StaySafe Plan occupancy restrictions." (*Id.*, Exs. 14-15.) During a recent visit to Minnesota, COVID-19 White House advisor Dr. Deborah Birx also encouraged Minnesotans to wear face coverings to slow the spread of COVID-19. (*Id.*, Ex. 16.)

EO 20-81 is supported by both industry and medical leaders. Both the Retail Industry Leaders Association (which represents major Minnesota retailers like Target) and the Minnesota Hospital Association urged the adoption of this executive order. (*Id.*, Exs. 17-18.) CEOs of major corporations, including Minnesota-based Best Buy, have also directly advocated for face covering mandates in all states. (*Id.*, Ex. 19.)

### B.     Face Covering Mandates Protect Public Health and the Economy.

Studies show that mandating face coverings in public is associated with a significant decline in the daily COVID-19 growth rate. (Ex. 21, Ex. 12.) South Carolina, for example, has seen a 46.3 percent greater decrease in COVID-19 cases in counties with a face covering mandate. (*Id.*, Ex. 22.)

Modeling estimates that face covering mandates have averted hundreds of thousands of COVID-19 cases in the U.S. (*Id.*, Ex. 21.) The University of Washington's Institute for Health Metrics and Evaluation estimates that a universal face covering policy in Minnesota will prevent hundreds of deaths from COVID-19 by November 1, 2020. (*Id.*, Ex. 23.) An analysis published by Goldman Sachs Research found that a national face covering mandate could prevent the need to bring back stay-at-home orders that

would otherwise cost an estimated 5% of U.S. gross domestic product. (*Id.*, Ex. 24.)

### C. EO 20-81 and Polling Places.

The CDC recommends that poll workers and voters wear masks in polling locations, to alleviate the risk of COVID-19 infecting both voters and poll workers on Election Day. (Kramer Decl., Ex. 25.)

Other states' experience shows that the risk of COVID-19 from in-person voting is significant. Public health officials confirmed that seventy-one people were infected with COVID-19 after voting in-person in Wisconsin's April 7 primary election. (*Id.*, Ex. 26.) A study found in-person voting in Wisconsin's primary resulted in 700 more COVID-19 infections in Wisconsin during the weeks following the election. (*Id.*) Similarly, one poll worker died from COVID-19 and others tested positive following the Illinois primary election. (*Id.*, Ex. 27.)

To mitigate the serious risk of COVID-19 infection at polling places, EO 20-81 requires that face coverings be worn inside polling places and outside when waiting in line to vote. However, the Order and associated guidance do not deprive any Minnesotan of the right or opportunity to vote. Voters who refuse to wear a face covering within the polling place will be provided with the opportunity to vote using curbside voting procedures, which allow the voter to vote outside without violating the Executive Order. (Kramer Decl., Exs. 28-29.) Furthermore, a voter who refuses to wear a face covering and refuses the curbside option will not be prevented from voting. (*Id.*) Poll workers are simply instructed to record the violation in the polling place incident log and allow eligible voters to cast a ballot. (*Id.*, Ex. 28.) Minnesotans are also able to request an

absentee ballot in advance of an election and vote by mail.[4]  Minn. Stat. § 203B.02 et.

seq.  In the August 11 primary election a record number of Minnesotans chose this

option.  (Kramer Decl., Exs. 30-31.)

## ARGUMENT

Plaintiffs' Amended Complaint fails because their claims are based on the faulty

premise of a conflict of laws that does not exist.  But even if that premise were accurate,

Plaintiffs' claims would fail because they are not justiciable.  Further, Plaintiffs have not

alleged any constitutional injury sufficient to overcome the high burden for challenging

an emergency order issued during a public health crisis.  As a result, Plaintiffs' Amended

Complaint fails to state any cognizable claim and should be dismissed.

## I.     RULE 12 STANDARDS.

State Defendants bring this motion for lack of subject-matter jurisdiction and

failure to state a claim under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

Where, as here, a Rule 12(b)(1) motion raises a facial challenge "the factual allegations

concerning jurisdiction are presumed to be true and the motion is successful if the

plaintiff fails to allege an element necessary for subject matter jurisdiction." *Titus v.

Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993).

Under Rule 12(b)(6), a motion to dismiss must be granted where the complaint

does not allege "enough facts to state a claim for relief that is plausible on its face." *Bell

Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The Court must accept as true the

---

[4] Plaintiffs' declarations assert that voting absentee is "less secure" and not as "reliable" as voting in person.  State Defendants vigorously disagree with these baseless and unsupported assertions.  Voting absentee by mail is safe and secure.  (Kramer Decl., Ex. 32.)

factual allegations in the complaint and draw all reasonable inferences in plaintiffs' favor. *Blankenship v. USA Truck, Inc.*, 601 F.3d 852, 858 (8th Cir. 2010). Legal conclusions, however, may be disregarded. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rule 12(b)(6) also authorizes dismissal "on the basis of a dispositive issue of law." *Neitzke v. Williams*, 490 U.S. 319, 326 (1989).

## II. THERE IS NO CONFLICT BETWEEN MINNESOTA'S ANTI-DISGUISE STATUTE AND EO 20-81 GIVING RISE TO THE ALLEGED INFRINGEMENT OF PLAINTIFFS' FIRST AMENDMENT RIGHTS.

Plaintiffs' claims are based on a faulty assumption. Plaintiffs acknowledged in their original complaint that "mask wearing [is] a good thing" to protect the health and safety of Minnesota residents during a pandemic (Doc. 1 at 1-2),[5] but wrongly conclude that Minnesota "criminaliz[es] wearing a mask and criminaliz[es] not wearing a mask in public places . . ." (Doc. 7 at 1.) The State has done no such thing. Because there is no conflict between Minn. Stat. § 609.735 and EO 20-81, Plaintiffs do not face the "damned-if-we-do, damned-if-we-don't" choice they present to the Court.

### A. Minn. Stat. § 609.735 Is Intended to Prohibit Individuals from Using a Disguise in Public to Conceal Their Identity.

Minnesota is one of many states around the country with statutes criminalizing disguising one's identity in public. (Kramer Decl., Ex. 33.) As in most states, the statute was enacted in response to the Ku Klux Klan ('the Klan"), a domestic terrorist organization designed to instill fear while keeping the identity of its members a secret. *Virginia v. Black*, 538 U.S. 343, 353-54 (describing the history of the Klan); (Kramer Exs. 33-34). The Klan emerged in Minnesota in the early 1920s. *Id.* Members have

---

[5] Citations to the record herein are made using the ECF document number ("Doc.").

historically worn masks or hoods while seeking to accomplish their goals. *State v. Miller*, 398 S.E. 2d 547, 550 (Ga. 1990).

With the Klan in mind, the Minnesota Legislature criminalized disguising oneself in public in 1923. Minn. Stat. ch. 100 ¶ 10300 (1923). Minn. Stat. § 609.735 now states in full:

> A person whose *identity is concealed* by the person in a public place by means of a robe, *mask, or other disguise*, unless based on religious beliefs, or incidental to amusement, entertainment, protection from weather, or medical treatment, is guilty of a misdemeanor.

(Emphasis added) (hereinafter, the "Anti-Disguise Statute"). The Anti-Disguise Statute, which is similar to ones that exist in many other states, was intended to combat "violence or threat of violence executed through more or less secret societies whose members' identities [had] been regularly obscured by the use of costumes and masks." *State v. Berrill*, 474 S.E. 2d 508, 514 & n.9 (W.Va. 1996); (Kramer Decl., Ex. 35)(noting that Klan activity in Minnesota commenced in 1921). As such, the focus of the Anti-Disguise Statute is on the intent of an individual to conceal their identity. Minn. Stat. ch. 100 ¶ 10300 (1923) (original version of the statute that prohibited individuals from wearing a "mask or other regalia or paraphernalia, *with intent thereby to conceal the identity of such person*") (emphasis added); *see also* (Kramer Decl., Ex. 35 at 365 (noting that following the passage of the law prohibiting using masks to conceal one's identity, thirty Klansmen marched in Owatonna with hoods but left their faces exposed)).

### B. EO 20-81 does not require concealing the wearer's identity.

Plaintiffs correctly recognize that EO 20-81 requires most Minnesotans to "wear a face covering in indoor businesses and indoor public settings." EO 20-81, at 3. They

also note that EO 20-81 explicitly states compliance with the Order will *not* result in a violation of Minn. Stat. § 609.735. *Id*. at 13. Nevertheless, they contend doing "a good thing" by wearing a face covering in public would put them in legal jeopardy. It would not. Applying Minnesota's canons of statutory interpretation, as well as its requirement of criminal intent, shows clearly that there is no conflict between the Anti-Disguise Statute and EO 20-81.

Under Minnesota law, a court interprets a statute to "effectuate the intent of the legislature." *State v. Koenig*, 666 N.W. 2d 366, 372 (Minn. 2003). "The first step in statutory interpretation is to determine whether the statute's language, on its face, is ambiguous." *State v. Thonesavanh*, 904 N.W. 2d 432, 435 (Minn. 2017). If the statute is only open to one reasonable interpretation, it is not ambiguous. *Id*. "A statute's words and phrases are to be given their plain and ordinary meaning." *Koenig*, 666 N.W. 2d at 366.; *see also Armstrong v. Mille Lacs County Sheriffs Dept*., 112 F. Supp. 2d 840, 847 (D. Minn. 2000).

As noted above, the Anti-Disguise Statute is designed to prohibit individuals from concealing their identity. Indeed, Minn. Stat. § 609.735 is entitled "Concealing Identity," and the statute targets a "person whose identity is concealed." Because "concealed" is not defined in the statute, the Court should rely on the term's plain and ordinary meaning, which is "kept out of sight or hidden from view." Merriam-Webster Dictionary at *https://www.merriam-webster.com/dictionary/concealed*; *see also* American Heritage Dictionary at *https://ahdictionary.com/word/search.html?q=concealed+* ("To keep from being observed or discovered; hide."). The face covering required by EO 20-81 does not

keep the wearer "out of sight", does not keep them "hidden from view", and does not keep them "from being observed or discovered." Instead, persons can easily be identified while wearing a face covering in public. *E.g.* Kramer Decl., Ex. 36 (Governor Tim Walz and Commissioner of Health Jan Malcolm clearly identifiable while wearing face coverings); *c.f. U.S. v. Pentaleri*, 2007 WL 4350798, at *2, 5 (D. Minn., Dec. 11, 2007) (stating that Minn. Stat. § 609.735 may have been violated when an individual at an airport was wearing a wig, fake moustache, and goatee).

The Anti-Disguise Statute lists some prohibited methods of concealing one's identity: "by means of a robe, mask, or other disguise". The face covering required by EO 20-81 is not the concealing mask contemplated by section 609.735. A "mask" is "a cover or partial cover of the face used for disguise" (Merriam-Webster Dictionary at *https://www.merriam-webster.com/dictionary/mask*), or a "covering worn on the face to conceal one's identity." (American Heritage Dictionary at *https://ahdictionary.com/word/search.html?q=mask*). In turn, a "disguise" is "apparel used to conceal one's identity" (Merriam-Webster Dictionary at *https://www.merriam-webster.com/dictionary/disguise)*, or "[c]lothes or accessories used to conceal one's true identity." (American Heritage Dictionary at *https://ahdictionary.com/word/search.html?q=disguise*). Moreover, the use of the term "other" before the word "disguise" indicates that the prohibition against robes and masks in public is not designed to prevent someone from picking up a newspaper on a public sidewalk while wearing a bathrobe or to prevent someone from wearing a face covering while shopping at an indoor business during a pandemic. Rather, it is to prohibit robes

and masks that disguise one's true identity, such as those traditionally used by the Klan.

### C. The Face Coverings Required by EO 20-81 Are Not Intended to Conceal Anyone's Identity.

Not only does the plain language and legislative purpose behind the Anti-Disguise Statute support the lack of conflict, but so does the *mens rea* element. "Criminal intent is embedded" in the Minnesota penal system such that criminal offenses normally "require both a volitional act and a criminal intent, referred to as *mens rea*." *State v. Moser*, 884 N.W. 2d 890, 895-97 (Minn. 2016); *see also United State v. Bugh*, -- F. Supp. 3d --, 2020 WL 2320141, at *13 (D. Minn., May 11, 2020) (recognizing that the Minnesota Supreme Court has expressed "a strong public policy against interpreting criminal statutes to impose strict liability"). Although Minnesota courts have not had an opportunity to interpret the Anti-Disguise Statute, the general principle applied by the Minnesota Supreme Court would militate against a conclusion that wearing a face covering for public health purposes, and not to conceal one's identity, would constitute a crime.

EO 20-81 requires most Minnesotans to use a "face covering," which, in addition to a scarf or bandana, may include certain masks that cover the nose and mouth (such as paper and cloth masks) but which specifically excludes other masks (such as mesh masks and masks with holes). The purpose of the Order is to slow the spread of COVID-19 and only certain masks are effective in doing so. EO 20-81 at 3. Nothing in EO 20-81 condones the use of face coverings as disguises or to conceal the wearer's identity. Notably, Plaintiffs do not suggest that if they were to comply with the face covering requirement they would do so in order to conceal their identities. Nor do they suggest

that others complying with EO-81 are doing so with the intent to conceal their identity. Therefore, they lack the *mens rea* to be criminally prosecuted. Other courts facing the same arguments about COVID-19 face-covering mandates have come to the same conclusion. *See Strother v. Northam*, Case No. CL20-260, Order Denying Temporary Injunction at 7 (10th Jud. Cir. Va., June 29, 2020)(attached as Kramer Ex. 37) ("Wearing a mask in accordance with [Virginia's mask requirement] defeats [Virginia's] criminal code's element of specific intent."); *see also State v. Miller*, 398 S.E. 2d at 552 (conviction under Georgia's similar statute "requires the State to prove that the mask was worn with an intent to conceal the identity of the wearer").

### D.    Even If There Were a Conflict, EO 20-81 Prevails

The analysis above comports with Minnesota law's requirement that courts both interpret statutes to avoid constitutional problems (*See State v. Irby,* 848 N.W.2d 515, 521 (Minn. 2014)) and to avoid conflicts with other statutes. Minn. Stat. §645.26, subd. 1 ("When a general provision in a law is in conflict with a special provision in the same or another law, the two shall be construed, if possible, so that effect may be given to both."). But even if we were to ignore all the arguments above, and accept the Plaintiffs' premise of an irreconcilable conflict between the Anti-Disguise Statute and EO 20-84, the executive order's mandate would prevail. That is both because it is the most recent law, and it is the most specific to the present COVID-19 emergency. *Id.*

### III.    THE COURT LACKS SUBJECT-MATTER JURISDICTION.

An independent basis to dismiss the Amended Complaint is Plaintiffs' lack of standing and State Defendants' immunity. *See Hagen v. Sisseton-Wahpeton Cmty. Coll.*,

205 F.3d 1040, 1043 (8th Cir. 2000) ("[I]mmunity is a jurisdictional question."); *Faibisch v. Univ. of Minn.*, 304 F.3d 797, 801 (8th Cir. 2002) (standing is jurisdictional).

Subject-matter jurisdiction is a threshold requirement which must be assured in every federal case. *Kronholm v. F.D.I.C.*, 915 F.2d 1171, 1174 (8th Cir. 1990). "If the asserted basis of federal jurisdiction is patently meritless, then dismissal for lack of jurisdiction is appropriate." *Biscanin v. Merrill Lynch & Co., Inc.*, 407 F.3d 905, 907 (8th Cir. 2005).

### A.    Plaintiffs Lack Standing.

Article III standing is designed "to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l.*, 133 S. Ct. 1138, 1146 (2013). The "standing inquiry" is therefore "especially rigorous when reaching the merits of the dispute would force [a court] to decide whether an action taken by" another branch of government is unconstitutional. *Id.* at 1147. Plaintiffs fail to meet this "especially rigorous" standard.

To demonstrate standing, Plaintiffs bear the burden to show: (1) they have "suffered an injury-in-fact"; (2) the injury is "fairly . . . trace[able] to the challenged action of the defendant"; and (3) it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). At the pleading stage, "the plaintiff must clearly allege facts demonstrating each element." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

### 1.    Plaintiffs fail to assert any "injury-in-fact".

To establish the required "injury-in-fact," Plaintiffs must show that there has been

"an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal citations omitted). "A concrete injury must be de facto; that is, it must actually exist." *Spokeo*, 136 S. Ct. at 1548.[6]  To be particularized, the injury "must affect the plaintiff in a personal and individual way." *Id*. The injury must also be "certainly impending"—allegations of possible future injuries are insufficient. *Clapper*, 133 S. Ct. at 1147.

Because MVA must establish, among other things, that its members "have standing to sue in their own right," the burden on it and the individual plaintiffs is identical. *See Friends of the Earth, Inc. v. Laidlaw Env'tl Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). The Amended Complaint asserts only that all Plaintiffs "have engaged, or propose to engage, in campaigning and voting activities either wearing a face mask or not wearing a face mask." (Doc 7, ¶18.)  It goes on to allege that Plaintiffs fear prosecution by one of the Defendants, and therefore their First Amendment political activity is chilled.  (*Id*.) This allegation fails to establish standing for at least two reasons.

First, Plaintiffs fail to assert any injury to them that differs from every other Minnesotan.  If the combination of Section 609.735 along with EO 20-81 is automatically a First Amendment violation, as Plaintiffs suggest, then all Minnesotans are equally harmed.  But "a plaintiff must have more than a general interest common to all members of the public" to have standing. *Lance v. Coffman*, 549 U.S. 437, 440, 127 S. Ct. 1194, 1197 (2007) (quotation omitted).  As one Tennessee judge explained recently, if every

---

[6] "Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo*, 136 S. Ct. at 1549.

citizen of the state is experiencing the same injury, it is not particularized:

> Plaintiff does not have standing to bring his claims because he has not alleged that he suffered a particularized "injury in fact." In other words, he does not contend that his constitutional rights were violated in any way that was not felt by all Tennesseans due to the Executive Orders in question.

*Maxwell v. Lee*, No. 20-1093-JDT-jay, 2020 WL 422012 (W.D. Tenn. July 23, 2020).

Second, Plaintiffs cannot and do not establish that their asserted injury—potential prosecution for either wearing, or not wearing a mask—is impending or certain. *See Clapper*, 133 S. Ct. at 1147. Indeed, Plaintiffs do not even assert that they want to go to a polling place without a mask, or take any other particular action, masked or unmasked. Therefore, they lack standing. *See Maxwell*, 2020 WL 422012 at *2; *see also Amato v. Elicker*, No. 3:20-cv-464, 2020 WL 2542788 (D. Conn. May 19, 2020) (finding no standing to assert First Amendment violation because plaintiffs pled no plans to take any prohibited conduct); *W.O. v. Beshear*, Civ. No. 3:20-cv-00023, 2020 WL 2314880 (E.D. Ky. May 9, 2020) (dismissing challenge to executive order based on failure to establish a credible threat of prosecution).

### 2. Individual Plaintiffs' alleged injury is not fairly traceable to State Defendants.

Plaintiffs have focused on one particular location where they are allegedly unclear whether to wear or not wear a mask: in-person voting at polling places. (Doc 7, ¶18.) However, that injury is not fairly traceable to State Defendants. EO 20-81 states clearly that its obligation to wear masks indoors does not conflict with the Anti-Disguise Statute. Further, guidance from the Minnesota Secretary of State on July 22, 2020 made clear that masks should be worn in the polling place, but individuals who showed up to vote in

person without masks would be given two options:  wear a disposable mask provided at the polling place or vote curbside.  If the prospective voter insisted on voting inside the polling place without a mask, they would be allowed to do that. (Kramer Decl., Ex. 28.)[7] Given the significant efforts to offer clear guidance on masking in polling places, as well as the lack of any evidence of enforcement of the Anti-Disguise Statute against Minnesotans wearing COVID-19 face coverings Plaintiffs are the only parties suggesting a legal conflict and resulting chill on political speech.  *See Clapper*, 568 U.S. at 416 ("[R]espondents cannot manufacture standing merely by inflicting harm on themselves.").  Plaintiffs' declarations stating that Plaintiffs' did not vote in the August 11 primary also do not grant them standing, as this was a self-inflicted and unnecessary action.  Plaintiffs do not even attempt to explain why they did not vote curbside at the polling place, and Plaintiffs assertions that absentee voting is somehow "less secure" or less "reliable" than in-person voting are wholly unsupported.  (Kramer Decl., Ex. 32.)

### B.      State Defendants Are Entitled to Immunity.

#### 1.      State Defendants are immune from claims alleging violation of Minnesota law.

The Eleventh Amendment does not allow a federal court to grant "relief against state officials on the basis of state law."  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). While the titles of all three of Plaintiffs' substantive counts allege violations of the U.S. constitution, the content of those counts make clear they are primarily claims of state law.  (Doc. 7, Counts 1 – 3.) For example, Count I alleges that

---

[7] Media coverage of the primary election has not included any instances of either masked voters being prosecuted under the Anti-Disguise Statute, or unmasked voters being precluded from casting a ballot.  (Kramer Decl., Ex. 38.)

EO 20-81 violates two provisions of the Minnesota Constitution. (*Id.* at ¶¶ 86-91.)   It goes on to allege that Minn. Stat. § 12.31, authorizing the peacetime emergency, is also a violation of the Minnesota Constitution.   (*Id.* at ¶¶ 92-94.)   Those assertions are also incorporated into Count II (*id.* at ¶ 124).   Even the caselaw about the Elections Clause makes clear that the Governor can have a role in elections, and it is fundamentally an issue of *state policy*.   *See Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 808 n.17 (2015); *Smiley v. Holm*, 285 U.S. 355, 368 (1932) ("Whether the Governor of the state, through the veto power, shall have a part in the making of state laws, is a matter of state polity").

The Plaintiffs' attack on the Governor's compliance with state law and policy is improper in state court.   The *Pennhurst* doctrine bars "a claim that state officials violated **state** law in carrying out their official responsibilities," *In re Abbott*, 956 F.3d 696, 720-21 (5th Cir. 2020), because "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." *Pennhurst*, 465 U.S. at 104.   In the COVID-19 context, numerous federal courts have rejected similar invitations by plaintiffs to police the boundaries of state law.   *See, e.g.*, *Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341, 344 (7th Cir. 2020); *Auracle Homes, LLC v. Lamont*, __ F. Supp. 3d.__, 2020 WL 4558682 (D. Conn. Aug. 7, 2020) (same); *Elmsford Apartment Assocs., LLC v. Cuomo*, No. 20-cv-4062, 2020 WL 3498456, at *6 (S.D.N.Y. June 29, 2020);.*PCG-SP Venture I LLC v. Newsom*, No. EDCV 20-1138, 2020 WL 4344631, at *11 (C.D. Cal. June 23, 2020); *Hartman v. Acton*, No. 2:20-cv-1952, 2020 WL 1932896, at *3 (S.D. Ohio Apr. 21, 2020).

### 2. State Defendants are also immune from the claims alleging violations of federal law.

"The Eleventh Amendment establishes a general prohibition of suits in federal court by a citizen of a state against his state or an officer or agency of that state." *281 Care Comm. v. Arneson*, 638 F.3d 621 (8th Cir. 2011). Each State Defendant is a state official sued in his official capacity (Doc. 7, ¶¶ 10-17), and is immune from suit unless Plaintiffs' claims fit within a recognized exception. In *Ex parte Young*, the Supreme Court established a limited exception to Eleventh Amendment immunity, allowing suit against a state official for prospective injunctive relief where: (1) the official has "some connection with the enforcement" of the challenged law; and (2) the official threatens and is "about to commence proceedings" to enforce the statute. 209 U.S. 123, 156–57 (1908).

### 3. The Secretary of State is immune.

The Secretary of State is not connected to enforcement of the EOs, meaning Plaintiffs cannot satisfy the first prong of *Ex parte Young*. EO 20-81—the only EO Plaintiffs challenge—provides criminal penalties for willful violations. (EO 20-81, ¶20.) The responsibility for prosecuting crimes in Minnesota has been "delegate[d] . . . to the offices of county attorneys and city attorneys." *State v. Lemmer*, 736 N.W.2d 650, 661–62 (Minn. 2007). Plaintiffs attempt to hold Secretary Simon responsible for criminal enforcement due to his office's issuance of a memo before the primary election. (Doc. 7, ¶¶ 70-71.) That document, which was sent to election officials, does nothing more than provide guidance on questions the Secretary of State's office had received from local election officials. It notes:

> The Office of the Secretary of State has received several questions as to how to handle face covering compliance in polling places under this executive order, and while you should consult your own county attorney, below is guidance that we hope is helpful as you work with your municipalities on polling place procedures.

(Kramer Decl. Ex. 28.)  The issuance of helpful guidance cannot convert the Secretary of State into a criminal prosecutor.  *See McCain v. United States*, No. 2:14-CV-92, 2015 WL 1221257, at *24 (D. Vt. Mar. 17, 2015) (finding Plaintiff lacked standing, in part because he was merely challenging guidance from EEOC, which had no legal force).

### 4.    The Governor is immune.

Similarly, the Governor is not connected to enforcement of the EOs.  The responsibility for prosecuting crimes in Minnesota lies with county attorneys.  Although the Governor has some criminal authority to prompt criminal prosecutions by the Attorney General, *see* Minn. Stat. §8.01, that authority is merely a "safety-valve alternative[] for use in extreme cases of prosecutorial inaction," *State ex rel. Wild v. Otis*, 257 N.W.2d 361, 365 (Minn. 1977).

Even if the Governor's limited criminal authority were a sufficient connection with the enforcement of EO 20-81, the Governor is still immune from suit because he has neither threatened Plaintiffs with nor is about to commence enforcement proceedings.  Plaintiffs do not allege otherwise.  Since there is no risk of enforcement action by the Governor, Plaintiffs' claims do not satisfy *Ex parte Young*.  *See Advanced Auto Transp., Inc. v. Pawlenty*, No. 10-159, 2010 WL 2265159, at *3 (D. Minn. June 2, 2010) (Governor immune because plaintiffs did not allege the Governor had "threatened a suit or [is] about to commence proceedings against [the plaintiff]").

### 5.    The Attorney General is immune.

The Attorney General is also immune.  Plaintiffs allege that the Attorney General enforces both the Anti-Disguise Statute *and* EO 20-81.  However, the Attorney General's authority to prosecute crimes is triggered only by a request from a county attorney or the Governor.  Minn. Stat. § 8.01.  The Anti-Disguise Statute is a misdemeanor. Plaintiffs make no allegation that the Governor or a county attorney has ever requested the Attorney General take over prosecution of the Anti-Disguise Statute, or any other misdemeanor.  Furthermore, while the Attorney General has authority to enforce EO 20-81 against businesses (EO 20-81 at ¶20), no Plaintiff alleges they fit in the definition of a business.  Nor does any Plaintiff allege that the Attorney General has either threatened Plaintiffs with, or is about to commence, enforcement proceedings.  Thus, the Attorney General is immune and Plaintiffs' claims against him must be dismissed.

Even if this Court finds State Defendants are not completely immune under the *Pennhurst* or *Ex Parte Young* doctrines, principles of federalism dictate it should at least abstain from the state law claims, if not the entire matter, as argued in the response to TRO.  (Doc. 35 at 23.)

### IV.    PLAINTIFFS FAIL TO STATE A CLAIM BECAUSE THE CHALLENGED ORDERS ARE A PROPER EXERCISE OF GOVERNMENT POWER DURING THE COVID-19 PANDEMIC UNDER *JACOBSON*.

"The Constitution does not compel courts to turn a blind eye to the realities of the COVID-19 crisis."  *Cassell v. Snyders*, 2020 WL 2112374, at *6 (N.D. Ill. May 3, 2020). Thus, requests to declare invalid executive orders issued during a public health crisis are

not evaluated under "traditional tiers of constitutional scrutiny."  *Id.*  Instead, courts give significant deference to emergency measures instituted during such crises under the standard from *Jacobson v. Massachusetts*, 197 U.S. 11, 27 (1905).  *See S. Bay United Pentecostal Church v. Newsom*, 590 U.S. __, 140 S. Ct. 1613, 1614 (2020) (Roberts, C.J., concurring).

Under *Jacobson*, courts may only overturn state action that lacks a "real or substantial relation to the protection of the public health" or represents a "plain, palpable invasion of rights secured by the fundamental law."  197 U.S. at 31.  Just weeks into this crisis, the Eighth Circuit confirmed that *Jacobson* applies to emergency orders issued to combat COVID-19.  It described *Jacobson* as "the Supreme Court's framework for reviewing constitutional challenges to state actions taken in response to a public health crisis."  *In re Rutledge*, 956 F.3d 1018, 1027 (8th Cir. 2020).  *Rutledge* then outlined the *Jacobson* test and its high level of deference to state policy makers as follows:

> [W]hen faced with a society-threatening epidemic, a state may implement emergency measures that curtail constitutional rights so long as the measures have at least some "real or substantial relation" to the public health crisis and are not "beyond all question, a plain, palpable invasion of rights secured by the fundamental law."  Courts may ask whether the state's emergency measures lack basic exceptions for "extreme cases," and whether the measures are pretextual—that is, arbitrary or oppressive.  At the same time, however, courts may not second-guess the wisdom or efficacy of the measures.

*Id.* at 1028 (8th Cir. 2020) (quoting approvingly *In re Abbott*, 954 F.3d 772, 784-85 (5th Cir. 2020), which quoted *Jacobson*).  Since EO 20-81 is the same sort of emergency measure at issue in *Jacobson, Abbott*, and *Rutledge*, precedent requires the Court to analyze their constitutionality using the *Jacobson* test.

Application of *Jacobson* is dispositive and demonstrates that the Amended Complaint fails to state a claim as a matter of law.

## A. The Order has a real and substantial relation to protecting public health.

EO 20-81 has a real and substantial relation to the protection of public health. Plaintiffs do not appear to challenge the relationship between EO 20-81 and the current pandemic. Nor would that be fruitful-- courts have found that face covering requirements bear a substantial relation to protecting the public health. *See Green v. Alachua County*, Florida, Case No. 01-2020-CA-001249 at 5 (8th Jud. Cir. Fla., May 26, 2020) (attached as Kramer Decl., Ex. 45) ("The stated purpose for the mask requirement is to limit the spread of this contagion, airborne virus and the [county] has provided evidence which includes substantial data indicating the face coverings may assist in reducing the spread of the virus."); *Antietam Battlefield KOA v. Hogan*, No. CV CCB-20-1130, 2020 WL 2556496, at *6 (D. Md. May 20, 2020)(face covering requirement has real or substantial relation to COVID-19 public health crisis); *Tigges v. Northam*, No. 3:20-CV-410, 2020 WL 4197610, at *7 (E.D. Va. July 21, 2020) (same); *see also* Administrative Order (D. Minn., May 15, 2020) ("Any person, including . . . members of the public, entering a U.S. courthouse in the District of Minnesota . . . must wear a mask or face covering.").

## 1. The Order does not plainly or palpably infringe upon any fundamental rights.

Under the second prong of *Jacobson*, there is no basis to conclude that EO 20-81 plainly or palpably invades Plaintiffs' fundamental rights. "[F]or the court to have the

authority to intervene in the State's response to the public health crisis, the [challenged regulation] must, 'beyond all question,' violate" a fundamental right of the plaintiff. *In re Rutledge*, 956 F.3d at 1030. But EO 20-81 does not plainly or palpably infringe on Plaintiffs' fundamental rights.

### a. EO 20-81 does not infringe on Plaintiffs' right to vote.

EO 20-81 is generally applicable law, yet Plaintiffs allege that it infringes on their right to vote. EO 20-81 does not prevent any Minnesotan from voting or otherwise violate Plaintiffs' right to vote. Plaintiffs may vote by mail or curbside without having to comply with the face covering requirement and even voters who choose to enter the polling place in violation of the face covering mandate will not be prevented from voting. Behavior in the polling place has never been free of regulation and there is simply no constitutional right to vote while behaving in a manner that endangers others. *See* Minn. Stat. §204C.06 ; *Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876, 1886 (2018) ("Rules strictly govern who may be present [in a polling place], for what purpose, and for how long.").

Plaintiffs also completely ignore the rights of other voters and the obligation of the state to run an orderly election. Voters who are wary of contracting the COVID-19 virus also have the right to vote in an orderly election. Allowing Plaintiffs to vote in-person without wearing a face covering will inhibit the ability of others who wish to vote in-person but who believe they cannot do so safely when those nearby are not wearing a face covering. Under extremely difficult circumstances, EO 20-81 balances the interests of all Minnesotans to maximize the opportunities for eligible voters to exercise their right.

Additionally, without the protection of the face covering mandate, poll workers may decline to work on Election Day and jeopardize having enough polling locations to run the election without long lines that may discourage citizens from voting. Conducting elections is the constitutional responsibility of the various states, and regulation by the states is necessary if our elections "are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974). The mask mandate furthers the State's legitimate interests in running a fair and orderly election, and protects the right of Minnesota voters to not contract COVID-19, without interfering with the right of Minnesotans who choose not to wear masks to cast their ballots.

> **b.** **EO 20-81 regulates conduct, not speech, and therefore does not plainly infringe on any first amendment rights.**

EO 20-81 does not infringe upon speech or any rights protected by the First Amendment. The Order is a content-neutral regulation of conduct, not speech. It requires most Minnesotans to wear a face covering in indoor public spaces and indoor businesses. It does not dictate what an individual may say or when and where they may express themselves.

The U.S. Supreme Court has cautioned: "We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends to express an idea." *U.S. v. O'Brien*, 391 U.S. 367, 376 (1968); *see also Rumsfield v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47 (2006) ("FAIR"). Indeed here, Plaintiffs appear to suggest their refusal to wear a face covering is a protest. (Doc. 7 at 2; Doc. 10 at 11.) However, even if the Court accepts the

premise that there is some communicative element in their refusal to wear face covering, their rights have not been plainly or palpably violated as required by *Jacobson*. There are still many avenues available to them to communicate their disagreement with the Governor's executive orders. *See Antietam Battlefield KOA v. Hogan*, No. CV CCB-20-1130, 2020 WL 2556496 (D. Md. May 20, 2020)(face covering requirement does not violate free speech rights); *see also Geller v. Cuomo*, 20Civ. 4653 (ER), 2020 WL 4463207 (S.D.N.Y. Aug. 3, 2020) (finding no first amendment violation in challenge to executive order).

### c. The Election Clause does not give Plaintiffs any fundamental rights.

Plaintiffs claim EO 20-81 violates the Election Clause of the U.S. Constitution by impermissibly establishing the "Manner of holding Elections." But, under *Jacobson,* courts will only scrutinize executive orders that infringe upon fundamental rights. There is no fundamental right to have the legislature set the manner of elections, without any input from the Governor.

***

For these reasons, Minnesota's face covering mandate is well within the State's authority under *Jacobson*. Because Plaintiffs have not demonstrated that any of their fundamental rights are plainly violated by the Challenged Orders, the court "may not second-guess the wisdom or efficacy of the measures," *In re Rutledge*, 2020 WL 1933122, at *5, and Plaintiffs cannot succeed on their claims. The motion should be denied.

## CONCLUSION

For the foregoing reasons, State Defendants respectfully request that Plaintiffs' Amended Complaint be dismissed in its entirety.

Dated:  September 11, 2020

Respectfully submitted,

KEITH ELLISON
Attorney General
State of Minnesota

s/ **Liz Kramer**
LIZ KRAMER (#0325089)
Solicitor General

MEGAN MCKENZIE (#0388081)
KEVIN FINNERTY (#0325995)
Assistant Attorneys General

445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131
(651) 757-1010 (Voice)
(651) 282-5832 (Fax)
liz.kramer@ag.state.mn.us

ATTORNEYS FOR DEFENDANTS
TIM WALZ, STEVE SIMON AND
KEITH ELLISION